IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| STEVEN R. DELK, | ) | |
|     Plaintiff, | ) | Civil Case No. 7:14cv00643 |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| MICHAEL C. YOUNCE, *et al.*, | ) | By: Norman K. Moon |
|     Defendants. | ) | United States District Judge |

This case is before the Court on Defendants' motion for summary judgment. (Dkt. 67). Plaintiff Steven R. Delk, a Virginia inmate proceeding *pro se*, filed a civil rights action pursuant to 42 U.S.C. § 1983 against various staff and officials at Red Onion State Prison ("Red Onion") and in the Virginia Department of Corrections ("VDOC"). Plaintiff contends that Defendants conspired against him, denied him access to the grievance process, denied him due process in determining his security classification, subjected him to cruel and unusual living conditions, and violated his religious rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, *et seq.* Plaintiff seeks damages, a declaratory judgment, and injunctive relief.

The procedural history of this case is critical to resolving (or in certain regards, not resolving) the instant motion. Defendants did not move to dismiss the complaint, and Plaintiff has propounded an array of interrogatories and other discovery requests. (*E.g.*, dkts. 11-15, 17-25, 66). Almost immediately after filing their motion for summary judgment, Defendants moved for a protective order "staying all discovery on the merits of the claims in this case until" their summary judgment motion and qualified immunity defense raised therein had been ruled up. (Dkt. 70 at 2). The presiding Magistrate Judge granted the protective order (dkt. 72), a logical

decision given that qualified immunity is immunity from suit and its corresponding burdens in discovery. *See Crawford-El v. Britton*, 523 U.S. 574, 598 (1998).

But there is a catch that complicates the situation. Although Defendants' summary judgment motion did contain a qualified immunity argument (albeit an underdeveloped one, as discussed later), it overwhelmingly focuses on other arguments, including those that either explicitly or implicitly rest on evidentiary grounds. (*E.g.*, dkt. 68 at 14 (discussing existence or nonexistence of grievances), 16 (citing certain VDOC operating procedures), 18 (asserting, largely without citation to the record, what process Plaintiff received), 21-23 (asserting without citations that Plaintiff is now receiving a Common Fare diet; evoking the motion to dismiss standard—*e.g.*, "allegations fail to state a plausible claim"—even though the case is on summary judgment, and claiming "none of the defendants have, in fact, violated any of Delk's constitutional rights"). In other words, Defendants have largely urged summary judgment on the merits (*i.e.*, argued there is no constitutional violation) rather than on the question of qualified immunity (*i.e.*, whether the right(s) violated—*assuming* that violation(s) occurred—were clearly established).

In a normal posture, this would be unproblematic. On any given Section 1983 claim, courts have discretion to decide the matter in different ways: They can either (A) first assess whether there was a violation of a right and, if so, then decide whether it was "clearly established," or (B) assume there was a right violated and go directly to the "clearly established" analysis.[1] *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009); *see also Rock for Life-UMBC v.*

---

[1] Approach (B) is driven in part by constitutional avoidance concerns, *Rock for Life*, 411 F. App'x at 556, and also employed to avoid the unnecessary expenditure of resources to assess whether the right was violated, when it otherwise is clear that that such right was not clearly established. Of course, if a court finds that the (presumptively) violated right was in fact clearly

2

*Hrabowski*, 411 F. App'x 541, 556 (4th Cir. 2010) (King, J., concurring and dissenting) (summarizing pre- and post-*Pearson* approaches).

But here, Defendants successfully blocked Plaintiff's access to discovery by obtaining a protective order based on the specter of their qualified immunity defense. Thus, Plaintiff has not had a robust opportunity to develop the facts of the alleged violations. This means that the Court is largely constrained to the "clearly established" inquiry of Approach (B) above, except perhaps for the clearest of purely legal grounds (or evidentiary analysis that would not result in dismissal). As the Fourth Circuit recently reiterated, "[g]enerally, a court should not *grant* summary judgment when, as here, outstanding discovery requests on material issues exist." *Raynor v. Pugh*, -- F.3d --, No. 14-7746, 2016 WL 1056091, at *6 n.5 (4th Cir. Mar. 17, 2016) (emphasis added). Indeed, *Raynor* presented a strikingly similar situation where a protective order was issued against an incarcerated *pro se* plaintiff because defendants raised qualified immunity. The district court then erred by deciding summary judgment on the merits, *i.e.*, whether the facts revealed a constitutional violation.

> Raynor also argues that the district court erred in denying him any discovery. . . . The district court stayed Raynor's discovery requests pending resolution of Pugh's qualified immunity defense, in accord with *Crawford–El v. Britton. See* 523 U.S. 574, 598, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). But, without ruling on the (meritless at this stage) qualified immunity claim, the court granted summary judgment on evidentiary grounds, faulting Raynor for 'not provid[ing] any evidence, other than his own affidavit, to support his allegations.' In so doing, the court erred. On remand the district court should permit appropriate discovery before entertaining any additional motions for summary judgment.

*Id.* at *6 n.5 (4th Cir. Mar. 17, 2016).

---

established, then it is required to determine whether the right was *actually* violated based on the facts.

Considering Defendants' motion for summary judgment in light of the foregoing, I will grant in part and deny in part the motion. I will lift the protective order, allow the parties to conclude discovery, and permit defendants to file a new motion for summary judgment.

## I. Facts on the Present Record

According to Delk, on April 9, 2013, Institutional Classification Officer Younce and Program Manager Hamilton caused Delk to be classified in long term segregation ("LTS") and Security Level S ("SLS") at Red Onion without having conducted a hearing first.[2] Major Gallihar and Regional Administrator Hinkle determined that Delk's related grievances and appeals were unfounded. Approximately every ninety days after his initial classification to LTS/SLS, Delk's classification was reviewed by Lieutenants Payne, Franklin, or Day, who repeatedly determined that Delk should remain in LTS/SLS, often times because he allegedly needed a "longer period of stable adjustment."[3] Unit Managers Swiney or Turner approved each of the Lieutenants' recommendations. Hinkle and Warden Mathena determined that each of Delk's grievances and appeals were unfounded. Delk alleges that no hearings (or on some occasions, no "meaningful" hearings) were held during his classification reviews. Delk argues

---

[2] Security Level S is the designation for segregation and is the VDOC's highest security level. VDOC Operating Procedure ("OP") 830.2 § IV, ¶¶ A.2, G.

[3] In addition, during Delk's review on June 25, 2013, Delk was also placed on Special Management Offender ("SMO") status. At a review on May 23, 2014, Delk was placed in "disciplinary isolation segregation" because he refused to participate in the Challenge Series Program ("Program"). Four days later, Delk was charged with a disciplinary infraction after he refused to participate in the Program, but the charge was later dismissed and he remained assigned to the LTS/SLS and "disciplinary isolation segregation."
  The Program "is a pathway for offenders to step-down from Security Level S to lower security levels in a manner that maintains public, staff, and offender safety." Hamilton Aff. ¶ 4. The Program is administered in accordance with OP 830.A and "is a cognitive program" that involves "study of 7 work books and pro-social goals." *Id.* Upon completion of the Program, a Level "S" offender's security level will be decreased to security level "6." *Id.*

4

that the defendants denied him due process by denying him hearings and/or "meaningful" hearings before his initial placement in LTS/SLS and at each subsequent classification review. Delk states that Defendants failed to follow their own procedures concerning his placement in LTS/SLS.

Delk also challenges his conditions of confinement. He states that he has "almost" no human contact and "no possibility of intellectual stimulation" in LTS/SLS. He also alleges that the lights are left on all the time; the food service and ventilation systems are unsanitary; he is served cold and smaller portions of food; he is subjected to "constant verbal abuse"; he has to be strip searched, kneel, and crawl to leave his cell; he has to hear staff and inmates slam security device covers and beat and kick doors, and he has to see inmates throw feces and flood their cells. Further, he alleges that he is being held there indefinitely without explanation, given "meaningless" hearings, and not earning good time.

As a result of his time in LTS/SLS, Delk alleges that he has suffered weight loss; "worsening" of an unspecified neurological condition; severe hand tremors; daily seizures; a chipped tooth from a seizure; hair loss; sleep loss; "constant, severe pain in [his] head"; worsening asthma; and a "detrimental effect" on his "future effort[s]" for "parole eligibility and pardon/clem[en]cy request[s]." Delk argues that defendants Younce, Hamilton, Hinkle, Payne, Franklin, Day, Swiney, Turner, and Mathena subject him to cruel and unusual living conditions by placing him in "highly restrictive, severe conditions of confinement for an indefinite period."

Delk also claims that defendants Younce, Hamilton, Hinkle, Payne, Franklin, Day, Swiney, Turner, and Mathena, all have conspired, in various groups, to place Delk in LTS/SLS, deny him "meaningful" reviews and hearings, and/or place him in disciplinary isolation.

5

Delk alleges that defendants Grievance Coordinator Messer, Regional Ombudsman Parr, former Operations Manager Robinson, Human Rights Activist Mullins, and Grievance Coordinator Bivens[4] denied him access to the grievance process by rejecting his grievances and/or appeals as untimely, not grievable, requests for services, or because he failed to follow procedure by filing an informal complaint first.

Finally, Delk assert that defendants Assistant Warden Walwrath, Faith Review Committee member Cei, Counselor King, Mathena, and Hinkle violated RLUIPA by not recognizing Delk's religion within the VDOC and then, after it was recognized, by denying Delk a diet consistent with his religious beliefs.

## II. ANALYSIS

Delk seeks, *inter alia*, damages against Defendants, and Defendants argue in their motion for summary judgment that they are protected by qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In determining whether the law was clearly establish, the court "'ordinarily need not look beyond the decisions of the Supreme Court, [the Fourth Circuit Court of Appeals], and the highest court of the state in which the case arose.'" *Lefemine v. Wideman*, 672 F.3d 292, 298 (4th Cir. 2012) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (1999)), *vacated on other grounds*, 133 S. Ct. 9 (2012).

### A. Defendants' Qualified Immunity "Argument"

---

[4] In his complaint, Delk identified this defendant as John Doe but later identified him as Robert Bivens. Docket No. 58.

The onus is on a defendant asserting qualified immunity to actually put forth authorities and argument showing that he is entitled to it. "The burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting that defense." *Meyers v. Baltimore Cty., Md.*, 713 F.3d 723, 731 (4th Cir. 2013). Defendants have not met their burden.

Nominally, their qualified immunity argument is two pages long. (Dkt. 68 at 23-25). Setting aside their overview of basic qualified immunity principles and summary of their position, the argument is two paragraphs, the first of which reads:

> As an initial matter, none of the named Defendants violated Delk's constitutional rights. Because there is no constitutional violation, each Defendant is entitled to qualified immunity on Delk's claim for monetary damages.

(*Id*. at 24). This is pure merits analysis incorporated by reference, not a "clearly established" inquiry. Accordingly, for the reasons stated at the outset of this opinion, it does not warrant a finding of qualified immunity. Defendants' second substantive paragraph states:

> Moreover, even assuming that there might have been some infringement upon Delk's constitutional rights, the unlawfulness of any such action would not be 'apparent when assessed from the perspective of an objectively reasonable official charged with knowledge of established law.' *Lopez*, 914 F.2d at 489. Placing an inmate into segregated confinement after conducting an ICA hearing into the necessity of the placement does not plainly violate constitutional law. Continuing to hold a noncompliance inmate in segregated confinement, while conducting periodic reviews of that inmate's security level, does not plainly violate established constitutional law. Additionally, the Department's policies and procedures pertaining to inmates held in segregated confinement have been upheld against due process challenges.

(*Id*. at 24-25).

It bears noting that, by Defendants' own admission, Plaintiff has asserted violations of his federal rights under the First, Eighth, and Fourteenth (Due Process) Amendments, as well as RLUIPA. These are all distinct legal rights with different requirements and bodies of caselaw. Yet Defendants by and large make no effort to distinguish between them or cite relevant

7

authority, instead relying on bald assertions that certain actions (which the Court reiterates Plaintiff has not yet had a chance to fully factually develop) do not "plainly violate established constitutional law." Generally, this is patently insufficient to carry one's burden of proof and persuasion on qualified immunity.

In support of their last sentence that does make specific mention of due process, Defendants cite two cases. The first—*DePaola v. Ray*, No. 7:12-cv-139 (W.D. Va. July 22, 2013)—is an unpublished report and recommendation that simply rejected a prisoner's due process claim on the merits by finding that a liberty interest was lacking; it did purported to engage in "clearly established" analysis. (Mem. Op. at 15, 29-33).[5] Likewise, the second case—*Smith v. Clarke*, No. 7:12-cv-32 (W.D. Va. Mar. 20, 2012)—was a summary dismissal at the pleading stage that did not contain clearly established analysis but instead found no liberty interest existed.[6] Further, unpublished district court opinions which "cannot be considered in deciding whether particular conduct violated clearly established law for purposes of adjudging entitlement to qualified immunity." *Hogan v. Carter*, 85 F.3d 1113, 1118 (4th Cir. 1996); *Hendrick v. Bishop*, No. TDC-14-2544, 2016 WL 1060212, at *10 (D. Md. Mar. 14, 2016).

---

[5] To be sure, *DePaolo*, after concluding plaintiff "failed to show that he had any liberty interest" and recommending dismissal for that reason—*i.e.*, the claim failed on the merits—continued on to summarily conclude "thus, I further find that the defendants are entitled to qualified immunity on this claims." *Id*. at 33. This, of course, is not a proper way for the Court to decide this case for the reasons stated above. The Court also questions whether it is logically coherent or necessary to ever so hold. To say a claim fails on the merits *and thus* qualified immunity applies is both duplicative (because the underlying claim is deficient anyway, so nothing need be said about qualified immunity, *i.e.*, whether the right was "clearly established") and confusing (because there has been no "clearly established" analysis, the *sine qua non* of qualified immunity).

[6] It also bears noting that in 2005, *Wilkinson v. Austin*, 545 U.S. 209, plainly stated that conditions of confinement in segregation may impose an atypical and significant hardship and that prisoners, therefore, have a liberty interest in avoiding those conditions. *Id.* at 223-24.

8

Accordingly, the Court will not grant qualified immunity at this stage, although Defendants may renew (and are encouraged to more fully develop) their arguments in a subsequent motion for summary judgment. Because Defendants have raised several other legal arguments that could arguably be assessed without resort to an evidentiary basis, the Court will address them briefly.

### B. Conspiracy

Delk claims that defendants Younce, Hamilton, Hinkle, Payne, Franklin, Day, Swiney, Turner, and Mathena, in various combinations, conspired against him to place him in his housing classifications and deny him "meaningful reviews/hearings." Defendants' summary judgment motion analyzes the claim as if it is at the motion to dismiss stage. (Dkt. 68 at 21-23). Of course, normally the Court would be obliged to consider the evidence, not allegations in the complaint. Dismissal on summary judgment here based on lack of evidence would be improper because Plaintiff has not had full discovery on the claim. Nevertheless, 28 U.S.C. § 1915(e)(2)(B)(ii) allows a court to dismiss a case "at any time" if the complaint fails to state a claim. The Court will do so here as to the conspiracy claim.

To establish a civil conspiracy under § 1983, a plaintiff must allege facts showing that the defendants acted jointly in concert and that some overt act was done in furtherance of the conspiracy, resulting in the deprivation of a federal right. *Glassman v. Arlington Cnty., Va*, 628 F.3d 140, 150 (4th Cir. 2010) (citing *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996)). A plaintiff must make specific allegations that each member of the alleged conspiracy shared the same conspiratorial objective, and the factual allegations must reasonably lead to the inference that the defendants came to a mutual understanding to try to "accomplish a common and unlawful plan." *Hinkle*, 81 F.3d at 421. As such, a complaint's allegations must amount to

9

more than "rank speculation and conjecture," especially when the actions are capable of innocent interpretation. *Id.* at 422. And of course, a formulaic recitation of the elements will not do.

Here, Delk's amended complaint (dkt. 32 at 10-11) offers only conclusory allegations of a conspiracy, which are insufficient to state a claim for civil conspiracy. *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus the conspiracy claim is due to be dismissed.

### C. Access to Grievances as a First Amendment Claim

Defendants (dkt. 68 at 19-20) construe portions of Plaintiff's case concerning a violation of his First Amendment rights. (*See* dkt. 32 at 13-17). Plaintiff asserts that defendants Messer, Parr, Robinson, Mullins, and Bivens denied him access to the grievance process when they rejected his grievances or denied his appeals. The denial of access to grievance procedures is certainly a relevant point as to any exhaustion arguments, which explains why Plaintiff cites 42 U.S.C. § 1997e(a) when describing the facts pertaining to what Defendants interpret as a First Amendment claim. However, insofar as Defendant does intend the denial of access to grievance procedures to pertain to an alleged violation of his First Amendment rights, his view fails as a matter of law. There is no constitutional right to participate in the VDOC's grievance process. *See Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (finding no "right to inform" prison officials of dangerous conditions); *Bane v. Va. Dep't of Correction*, No. 7:06-cv-733 (W.D. Va. May 8, 2007) (Mem. Op. at 14-15).[7]

### D. Due Process

Delk claims that Defendants' determinations to house him in LTS/SLS violated procedural due process. Evaluation of a procedural due process claim requires a two-step

---

[7] Because there are no other allegations against Messer, Parr, Robinson, Mullins, and Bivens in the amended complaint, these defendants will be terminated from the action.

10

analysis. First, the court must determine whether Delk had a protected liberty interest in being released from LTS/SLS. *Incumaa v. Stirling*, 791 F.3d 517, 526 (4th Cir. 2015). If he did have a liberty interest in the classification decision, then the court must determine whether Defendants afforded him minimally adequate process in making that decision. *Id.*

"A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' . . . or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted). By virtue of his status as a prisoner, Delk does not have an inherent constitutional liberty interest in release from a more restrictive security classification. *Id.* at 221-22. A state-created liberty interest may exist, however, if Delk can "point to a Virginia law or policy providing him with an expectation of avoiding the conditions of his confinement," *Prieto v. Clarke*, 780 F.3d 245, 252 (4th Cir. 2015), and if his continuing confinement in segregation "imposes atypical and significant hardship . . . in relation to the ordinary incidents of prison life," *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The VDOC's policy that the Institutional Classification Authority ("ICA") "perform periodic reviews on each Security Level S offender," OP 830.2 § IV, ¶ G.7, satisfies the requirement that any potential liberty interest arise from state law or policy.[8] *See Incumaa*, 791 F.3d at 527. Thus, the court ordinarily looks to whether Delk has established that his confinement in LTS/SLS was an atypical and significant hardship in relation to the ordinary incidents of prison life. Even with the handicap of not being afforded full discovery, Plaintiff's due process claim survives at this juncture.

In *Incumaa*, the Fourth Circuit observed that "[w]hether confinement conditions are atypical and substantially harsh 'in relation to the ordinary incidents of prison life' is a

---

[8] I note that defendants do not challenge that Delk had an expectation of avoiding the conditions of confinement. (Dkt. 68 at 15).

11

'necessarily . . . fact specific' comparative exercise." 791 F.3d at 527 (quoting *Beverati v. Smith*, 120 F.3d 500, 502, 503 (4th Cir. 1997)). Courts must first determine a comparative "baseline" that "constitutes the 'ordinary incidents of prison life' for this particular inmate." *Id.* (quoting *Prieto*, 780 F.3d at 253)). With the baseline established, courts then "determine whether the prison conditions impose atypical and substantial hardship in relation to that norm." *Id.*

Therefore, the Court inquires whether the specific facts thus far establish, as a matter of law, that the conditions of Delk's confinement in LTS/SLS are not an atypical and significant hardship in relation to the ordinary incidents of prison life. The Supreme Court's decision in *Wilkinson* provides a helpful comparison. In *Wilkinson*, the Supreme Court considered the conditions at an Ohio "Supermax" facility to be "synonymous with extreme isolation." 545 U.S. at 213, 214. The Court observed that:

> Almost every aspect of an inmate's life is controlled and monitored. Inmates must remain in their cells . . . for 23 hours per day. A light remains on in the cell at all times, though it is sometimes dimmed, and an inmate who attempts to shield the light to sleep is subject to further discipline. During the one hour per day that an inmate may leave his cell, access is limited to one of two indoor recreation cells.

*Id.* The Court also noted that inmates were prevented from communicating with one another by solid metal cell doors, ate all meals alone, and had only rare opportunities for visitation through glass walls. *Id.* In addition, the Court found it significant that inmates placed in this unit remained there indefinitely (with review of their confinement status occurring only once per year) and were disqualified from eligibility for parole. *Id.* at 224. The Court concluded that "[w]hile any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." *Id.* Notably, the Court found this to be true "under any plausible baseline." *Id.* at 223.

12

Delk has been housed in LTS/SLS for almost three years. In response to Defendants' motion for summary judgment, Delk states that, as compared to the conditions of confinement for inmates housed in Red Onion general population, his conditions of confinement create an atypical and significant hardship. As examples, Delk states that he is subject to a cavity search before kneeling and crawling backwards every time he leaves his cell, but general population inmates do not go through these steps. He states that he is "locked in his cell alone for 24 hours a day unless the security staff chooses to allow him to shower or go to recreation," but general population inmates leave their cells daily. Delk's cell is fitted with an "unsanitary and dangerous" metal security box device to prevent contact, but general population inmates do not have these security devices. Delk is not allowed to use a mirror and has seen his face only four times in the last three years, but general population inmates are allowed to purchase plastic mirrors. Rubber and metal barriers are "strategically placed" around the solid steel door of Delk's cell to impede communication, but general population inmates are encouraged to communicate. Delk's food is served in unsanitary condition by untrained staff, but general population inmates are served food by trained kitchen staff who are overseen by a supervisor. Delk has not seen or heard a radio or television since 2013, and his only access to social media is through the free religious magazines available from the chaplain. General population inmates, however, have a radio and television in their living area. Delk has not gone outside in three years, but general population inmates go outside three to four times per week.

Defendants briefly conclude that Delk's alleged experiences are not atypical or significant by comparing his conditions to those conditions of other segregated inmates. Delk was not sentenced to death row, as was the case in *Prieto*, and thus, Delk's "baseline" for comparison must be to general population conditions. *See Incumaa*, 791 F.3d at 527. Based on

13

current record, the conditions Plaintiff allegedly experiences in LTS/SLS appear to be an atypical and significant hardship in relation to the conditions of confinement for general population inmates. Consequently, I cannot find that defendants have shown that, as a matter of law, Delk did not have a protectable liberty interest in being released from LTS/SLS.

There is also the issue of constitutionally sufficient process. Delk avers that he was not present at hearings or given "meaningful" hearings before and during his assignment to LTS/SLS. Consequently, the court is constrained to find Defendants are not presently entitled to judgment as a matter of law. The record is not yet fully developed at this time, so it would be improper to grant summary judgment. *Raynor*, 2016 WL 1056091, at *6 n.5.

### E. Eighth Amendment—Conditions of Confinement

Delk challenges his conditions of confinement. The Eighth Amendment imposes certain duties on prison officials to provide humane conditions of confinement, ensure that inmates receive life's necessities, and take reasonable measures to guarantee the safety of inmates. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The constitutional prohibition against the infliction of cruel and unusual punishment "does not mandate comfortable prisons, and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). Eighth Amendment protection from cruel and unusual living conditions has both objective and subjective components. First, deprivations must be objectively serious in the sense that they violate contemporary notions of decency. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Second, the plaintiff must show that, subjectively, the prison officials acted with a sufficiently culpable state of mind. *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993). The Supreme Court has held that prison officials cannot be held liable under the Eighth

Amendment unless they knew of and disregarded an excessive risk to inmate health or safety. *Farmer*, 511 U.S. at 837. A plaintiff must produce evidence of serious or significant physical or emotional injury resulting from the challenged conditions to withstand summary judgment on a prison living conditions claim. *Strickler*, 989 F.2d at 1380-81.

Delk contends that in LTS/SLS, he is deprived of human contact and intellectual stimulation, the lights are left on all the time, the food service and ventilation systems are unsanitary, he is served cold and smaller portions of food, he is subjected to "constant verbal abuse," he has to be strip searched and then kneel and crawl to leave his cell, he was deprived showers and recreation, he has to hear staff and inmates slam security device covers and beat and kick doors, and he has to see inmates throw feces and flood their cells. In addition, he asserts that he is being held in LTS/SLS indefinitely without earning good time. Delk argues that these conditions subjected him to "psychological and physical torture." Specifically, he states that he suffered weight loss, "worsening" of an unspecified neurological condition, severe hand tremors, daily seizures, a chipped tooth from a seizure, hair loss, sleep loss, "constant, severe pain in [his] head," and worsening asthma. Based on the present state of the record and the need for it to be developed further, summary judgment is not appropriate at this time.[9]

### F. RLUIPA

Delk alleges that defendants Walwrath, Mathena, Hinkle, Cei, and King violated RLUIPA by not recognizing his religion within the VDOC and/or denying him a diet consistent with his religious beliefs. Inasmuch as RLUIPA does not authorize claims for damages, I will

---

[9] In their motion for summary judgment, defendants argue that Delk failed to exhaust administrative remedies as to this claim. In response to the motion and in his complaint, Delk states that he did not have access to the grievance process. Aside from providing a legal justification for failing to exhaust remedies (if such failure actually existed), there remain factual issues to be developed during discovery as to exhaustion.

15

grant the motion for summary judgment as a matter of law as to that relief. *Sossamon v. Texas*, 563 U.S. 277, 281 (2011), *Rendelman v. Rouse*, 569 F.3d 182, 187-89 (4th Cir. 2009). Defendants argue—without citation to the record—that the injunctive relief claim is moot because Plaintiff now receives a "Common Fare diet." Plaintiff asserts the claim is not moot, citing continuing deprivation of his religious rights. (*E.g.*, dkt. 81 at 5, 15-16 (referring to deprivation of Plaintiff's "no egg" diet)). Given this material dispute of fact, Plaintiff's entitlement to further discovery, and the complex burden-shifting framework of RLUIPA that requires a developed record, summary judgment on the RLUIPA claim as to injunctive relief is denied.

## III.

For the reasons stated, I will grant Defendants' motion for summary judgment as to Plaintiff's claim for damages under RLUIPA and his First Amendment claim for access to grievance procedures. I also will dismiss his conspiracy claim under 28 U.S.C. § 1915(e)(2)(B)(ii). Messer, Parr, Robinson, Mullins, and Bivens will be terminated as defendants.

The motion for summary judgment otherwise will be denied, including as to qualified immunity, but without prejudice to Defendants' ability to renew and refine their arguments on another summary judgment motion after discovery is completed. The protective order in this case will be vacated and discovery will proceed as ordered. The Clerk is directed to send a copy of this opinion to counsel and to Plaintiff.

**ENTER**: This  31st  day of March, 2016.

*/s/ Norman K. Moon*
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

16