**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **STEVEN DELK,** | ) | **Civil Case No. 7:14cv00643** |
| **Plaintiff,** | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **MICHAEL C. YOUNCE, *et al.*,** | ) | **By: Norman K. Moon** |
| **Defendant(s).** | ) | **United States District Judge** |

Steven Delk, an inmate proceeding *pro se*, filed this action under the Civil Rights Act, 42 U.S.C. § 1983, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1 to 2000cc-5. Delk sued administrators in the Virginia Department of Corrections ("VDOC") and officials at Red Onion State Prison ("Red Onion") contending, among other things, that he had been classified to long-term segregation without due process, where he was subjected to unconstitutional living conditions and suffered a substantial burden on the free exercise of his religious dietary beliefs. After review of the record, I conclude that Defendants' motion for summary judgment must be granted.

## I. BACKGROUND

### A. Long-Term Segregation and the Step-Down Program

Red Onion and Wallens Ridge State Prison ("Wallens Ridge") house all VDOC Security Level S ("SLS") inmates, those who must be managed in a long-term segregation setting.[1] Under current policies, once a VDOC inmate is classified as SLS, officials transfer him to one of these facilities, where he may participate in the Segregation Reduction Step-Down Program set

---

[1] According to the VDOC operating procedure for security level classification, effective on January 1, 2015, inmates are classified to Level S based on "segregation qualifiers," including the following: aggravated assault on a staff person or on another offender using a weapon or resulting in serious injury; serious risk of escape; "[c]ommission of a crime of exceptional violence and/or notoriety"; "[e]xcessive violent [d]isciplinary [c]onvictions"; fire setting or rioting in prison that harmed a person or caused extensive property damage; hostage taking; possessing firearms or other weapons; gang activity or leadership; and manipulating staff or displaying predatory behavior. (*See* OP 830.2. § IV, ¶ G, at 1-10, docket no. 68-6.)

out in Operating Procedure ("OP") 830.A. (OP 830.A, at 28-47, docket no. 133-9). This version of the step-down procedure became effective on February 18, 2013, with the stated purpose to provide "established procedures for incentive based offender management which will create a pathway for offenders to step-down from Security level S to lower security levels in a manner that maintains public, staff and offender safety." (OP 830.A, § I.)

Each newly classified SLS inmate is assessed and assigned to the appropriate privilege level: intensive management ("IM"), special management ("SM"), or the reentry unit (reserved for inmates within two years of release). (OP 830.A, § III.) An inmate is assigned to SM status if evaluators find that he has a history of "repeated disruptive behavior at lower level facilities, . . . fighting with staff or offenders, and/or violent resistance" that harmed staff or other inmates, but "without the intent to invoke serious harm, . . . kill, or [cause] serious damage to the facility." (*Id.*) Inmates are further sub-classified under OP 830.A as follows, starting with IM-0 or SM-0, the most restrictive statuses, and ending with the general population, the least restrictive.

Intensive Management (IM):
IM-0
IM-1
IM-2
IM-SL6
Special Management (SM):
SM-0
SM-1
SM-2
SM-SL6
Step-Down—Level 6 General Population
Structured Living—Phase 1 and Phase 2
Security Level 5 General Population

The step-down program in OP 830.A is a so-called cognitive program that involves meeting pro-social goals and requires the inmate to complete a seven-workbook set called the

2

*Challenge Series*, remain infraction free, exhibit responsible behavior, and participate in self-improvement and education programs. When an inmate meets the goals designated for a step, he may be advanced to the next step and receive the additional privileges assigned to it. When an SM-0 inmate makes sufficient progress toward the goals of that step, he will be advanced to SM-1 or SM-2, where he will be permitted additional privileges, including use of electronics and the chance to apply for an in-pod job.

While assigned to any of these segregation levels, the inmate's classification status will be periodically reviewed by the Institutional Classification Authority ("ICA"). Members of the Unit Management Team, a multi-disciplinary group of staff who work in the housing units, track and rate each inmate's progress toward the goals of his assigned step. They rate his behavior every week as poor, acceptable, or good in each of several categories, such as personal hygiene, standing for count, and respect. Counselors rate the inmate's program participation every week as incomplete, complete, or positive effort. Officers in each of these groups are encouraged to communicate with inmates about these ratings — to acknowledge positive performance and motivate improvement where needed.

In addition to Unit Management Team review of an inmate's classification status, certain classification decisions are also reviewed by a Dual Treatment Team made up of officials from both Red Onion and Wallens Ridge, by the wardens of the two institutions, or by the VDOC regional operations chief. In addition to this multi-level review scheme, "[a] team external to [Red Onion and Wallens Ridge] will perform an annual review of each [SLS] offender's case." (OP 830.A, § IV, ¶ K.1.a.) This review includes a reassessment of whether the inmate continues to meet the criteria for the IM or SM path to which he has been assigned. According to OP

830.1, § IV, ¶ G, all classification decisions may be appealed through the Offender Grievance Procedure, to which SLS inmates have access.

All SLS inmates in the IM and SM categories are housed in single cells. When any SLS inmate leaves his cell, he must undergo a visual strip search and be restrained in handcuffs and shackles. In full restraints, he is then escorted by two officers at all times to recreation, to the shower, or to medical appointments. Outdoor recreation consists of being locked in a fenced, cage-like area to walk or do calisthentics.

On the other hand, the segregation cells provide living conditions approximately the same as those provided to general population inmates, and the cell design permits inmates to converse with and be observed by staff members. Per policy, SLS inmates receive meals in their cells (the same number and types of meals that inmates in general population units receive), are permitted to shower and shave not less than three times per week, and have out-of-cell recreation for one hour, up to six days per week. They have the same mail regulations and privileges as inmates in other housing assignments, receive clean clothes and bed linens, and have access to medical and mental health care. They are allowed visitation, use of a telephone, access to legal services and library books; they may possess items of personal property (including religious materials) and may order items from the prison commissary.

When the SM inmate completes the *Challenge Series* and meets the goals for SM-2, he may be decreased from SLS to Security Level 6 ("SL6"). At this point, officials assess each inmate and assign him to one of three SL6 step-down pods geared to safely reintroduce him in phases into a social environment to interact with other inmates and test his readiness for possible transfer to Level 5 and, eventually, to other non-segregation settings. Inmates in SM-SL6 Phase 1 are still in single cells, but they are permitted to leave their cells unrestrained for movement to

4

the shower and recreation and, gradually, to participate in the *Thinking for a Change* curriculum with other inmates in groups of up to fifteen participants. Inmates in SM-SL6 Phase 2 have cell mates, are unrestrained for showers and recreation, have outside recreation with other inmates for an hour, twice a week, and can walk to meals with other inmates to eat their meals together in the dining hall. If the inmate completes the goals in SL6, he may then be reduced to Security Level 5 and be placed in a general population setting.

### B. Delk's Classification History

Delk arrived at Red Onion on July 16, 2012 and was assigned to the general population. On March 1, 2013, he was assigned to segregation, because he had received a disciplinary charge for possession of a weapon. On March 4, the ICA recommended that Delk remain in segregation pending the outcome of the disciplinary proceeding. On April 3, the ICA noted that Delk had received five new institutional infractions since March 1, 2013: three charges for possessing a weapon, one charge for possessing a razor blade, and one charge for possessing tobacco. Accordingly, the ICA recommended an increase for Delk from Security Level 5 to SLS and a decrease in his good time earning rate from Level 1 (earning the most available good time) to Level 4 (earning no good conduct time).

At an informal review on June 20, the ICA recommended that Delk be assigned to the Special Management pathway, SM-0, based upon his recent disciplinary history and a need for a longer period of stable adjustment. SM-0 inmates are those who exhibit inappropriate behavior or choose not to participate in the step-down programming. The ICA reviewed Delk's housing status on September 19, 2013, and recommended that he remain at SM-0 because he needed a longer period of stable adjustment. At reviews on December 2, February 28 and May 21, 2014,

5

the ICA recommended that Delk remain at SM-0 because of his nonparticipation in programs and a continued need for stable adjustment.

On June 5, 2014, during Delk's annual review, the ICA reviewed his housing status and goodtime earning rate. The ICA noted that Delk had not held a work assignment or participated in treatment programming. Therefore, the ICA recommended that Delk remain an SLS inmate and continue at Level 4, earning no good time. He remained at SM-0 through regular reviews in August and November, 2014, and February and May 2015, based on nonparticipation in step-down programming. At his annual review on June 26, 2015, the ICA recommended that Delk remain an SLS inmate, again noting his failure to complete programming or hold a job assignment. Based on these same factors, at reviews in July and October 2015, and January and April 2016, the ICA recommended that Delk remain at SM-0.

In addition to these reviews of Delk's status, the External Review Team has conducted evaluations of his step-down pathway assignment on at least five occasions. These sessions are informal ones, "intended to function as an additional, outside check to insure that all offenders are given an appropriate opportunity to progress through the step-down program." (Artrip Aff. ¶ 7, docket no. 126-1.)

Delk alleges that his initial assignment to SLS in April 2013 occurred without a formal hearing, in violation of VDOC policies. He also alleges that Defendants violated his due process rights by denying him hearings and/or "meaningful" hearings before each subsequent classification review and decision, in violation of their own classification procedures.

C. Delk's SLS Conditions Complaints

Delk challenges his conditions of confinement as an SLS inmate. He states that he has "almost" no human contact and "no possibility of intellectual stimulation." He complains that

his steel cell door is fitted with metal security box over the tray slot and rubber or metal barriers on the door edges to prevent contact and hamper communication; he has not seen or heard a radio or television since 2013; and his only access to social media is through free religious magazines the chaplain provides. Delk also alleges that the lights are left on all the time; the food service and ventilation systems are unsanitary; food portions are cold and (he believes) smaller than those general population inmates receive; officers subject him to "constant verbal abuse"; he has to be strip searched, kneel, and crawl to leave his cell;[2] he has to hear staff and inmates slam security device covers and beat and kick doors, and he has to see inmates throw feces and flood their cells.[3] Further, Delk alleges that his SLS confinement is indefinite, without explanation, and prevents him from earning good conduct time.

Delk alleges that while subject to SLS conditions, he has suffered weight loss; "worsening" of an unspecified neurological condition; severe hand tremors; daily "seizures"; a chipped tooth from a seizure; hair loss; sleep loss; "constant, severe pain in [his] head"; worsening asthma; and a "detrimental effect" on his "future effort[s]" for "parole eligibility and pardon/clem[en]cy request[s]." (Am. Compl. 8-9, docket no. 32.)

Defendants offer the affidavit of V. Phipps, head nurse at Red Onion. Phipps notes that according to medical records, Delk weighed 175 pounds upon arrival at Red Onion on July 19, 2012, and his next recorded weight on May 21, 2013 was 150 pounds. The records reflect that between that date and May 26, 2015, Delk's weight steadily increased to 155 pounds. Phipps

---

[2] Defendants provide evidence that per policy, before leaving his cell, an SLS inmate must remove his clothes in view of security staff to ensure that he does not have a weapon hidden on his person to use against staff or other inmates outside the cell. Defendants deny that the inmate is required to crawl during this process; they state that for removal of shackles upon return to the cell, the inmate "kneels on a 'kneel zone' in front of the cell door in view of the pod camera." (Younce Aff. ¶ 26, docket no. 68-2.)

[3] Defendants offer evidence that while inmates in SLS do commit such disturbing acts in violation of VDOC rules, when they do so, officers respond quickly to restore order and take disciplinary action against the violators.

7

states, "A 20 lbs. weight loss over three years is not an extreme weight loss." (Phipps Aff. ¶ 4, docket no. 68-1.) Phipps further states that according to Delk's medical records, he has been provided with a prescription inhaler for asthma, has been diagnosed with an allergy to beans, and has been seen by medical staff for his *complaints* of head and shoulder pain, tremors while writing and brushing his teeth, and seizures. Phipps also states that Delk is "unable to give symptoms nor has anyone witnessed such claimed seizures." (*Id.* ¶ 5.) Phipps states her medical opinion that "Delk's medical records do not document that he voiced any complaints that could be attributed to the conditions of segregation." (*Id.* ¶ 6.)

Delk recently notified the court that on February 10, 2017, he was transferred to Wallens Ridge. The record does not include information about Delk's ICA classification reviews after April 2016 or indicate whether he is still SLS and SM-1 under the step-down procedure.

### D. Delk's Religious Diet

Delk states that he "adher[s] to the ways of the Goddess Mother," a belief system recognized by the VDOC as "Wiccan," although Delk also calls himself as Pagan. (Delk Aff. ¶ 1, docket no. 137.) He describes his beliefs as follows: "I am the high priestess/priest of my coven. I reflect that which is Nature. Because I am Nature. That which is organic pure natural is my required diet. She expects nothing else. But the VDOC only provide[s] only a portion of what I require[ ]. But [the VDOC Common Fare religious diet program is] the closest to what my religious bel[ie]f require[s]." (*Id.* ¶ 3.)

In 2013, Delk requested and was granted a diet order for meals free of eggs, based on his Pagan/Wiccan belief that he should not eat animal embryos, and free of beans, based on his medically diagnosed allergy. In June and September 2013, and again in April 2014, however, Delk asked to participate in Common Fare. The ICA noted Delk's report that his Pagan/Wiccan

8

religious beliefs required him to consume "organic foods." (Younce Aff. Attachment, at 49, docket no. 68-2.) Officials at first approved, but ultimately, denied Delk's Common Fare requests for various reasons. Among other things, they advised him that per policy, his religion was not approved to meet in VDOC facilities and, later, that his diet request should document specific religion-related items he possessed as evidence of his sincerity of belief. Delk renewed his diet request in April 2015, provided the necessary documentation, and was approved. He began receiving Common Fare meals on June 10, 2015.

In his post-summary judgment submissions, Delk asserts that when he began receiving Common Fare meals, he discovered for the first time that they contain both eggs and beans. In response to his complaints about this fact, kitchen staff responded that the Common Fare meal order that he had requested, had replaced his previous diet order, and they could not make the requested food substitutions to the VDOC-wide Common Fare menu.[4] By June 18, 2015, however, they advised Delk that they would accommodate his allergy to beans.[5] Delk went without eating the eggs in his meals until February 2016, when he saw another inmate receiving Common Fare meals without eggs as an accommodation of his Sunni Muslim religious beliefs. Delk then asked the kitchen staff for a similar accommodation of his Pagan beliefs. Starting on March 2, 2016, Delk's Common Fare meals no longer contained eggs.[6]

E. Case History

Delk initially filed this § 1983 complaint in November 2014 and filed an amended complaint in January 2015. Defendants moved for summary judgment. They also moved for

---

[4] "The planned Common Fare menu may not be changed at the facility level, except for seasonal produce availability, donated kosher commodities and kosher special buys." (Food Service Manual 2, docket no. 133-9.)

[5] In response to Delk's request for no eggs and no beans, kitchen staff responded: "Since you are receiving the VADOC's religious diet changes are not made to individual specification. However we are changing to accommodate your bean allergy." (See Delk Aff. Attachment, at 7, docket no. 137.)

[6] (See Delk Aff. ¶ 2-3, docket no. 93.)

9

and were granted a protective order against discovery, pending a decision on their threshold defense of qualified immunity. In an earlier opinion and order, I denied Defendants' motion on the ground of qualified immunity as to three of Delk's claims and lifted the protective order.[7] *Delk v. Younce*, No. 7:14CV00643, 2016 WL 1298389 (W.D. Va. Mar. 31, 2016).

The three issues from Delk's amended complaint that remain before the court are: (1) Delk has been assigned to SLS in April 2013 and held at SM-0 or SM-1 without due process, in violation of the Fourteenth Amendment; (2) conditions in SLS are cruel and unusual, in violation of the Eighth Amendment; and (3) Red Onion officials have failed to provide Delk with the diet his religion required, in violation of RLUIPA.[8] For these alleged violations of his rights, Delk seeks monetary damages, declaratory relief, and injunctive relief directing that Delk be transferred to an institution that provides due process in classification decisions and that he be provided with the Common Fare diet.

---

[7] In the March 31 opinion and order, I granted summary judgment as to Delk's First Amendment claim regarding denial of access to the prison's grievance procedures and his claims for damages under RLUIPA. I also summarily dismissed his § 1983 conspiracy claim under 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state facts supporting the required elements of a civil conspiracy claim. I note that Delk also asserted a claim concerning denial of access to the grievance procedures under 42 U.S.C. § 1997e(a). I will summarily dismiss this claim, because § 1997e(a) neither requires prison officials to provide grievance procedures nor authorizes a private cause of action such as Delk is attempting to bring. I will also summarily dismiss the conspiracy claims under 42 U.S.C. §§ 1985 and 1986 as asserted in Delk's amended complaint. To state a claim under these statutes, in addition to stating the elements of a conspiracy claim, the plaintiff must "include an allegation of 'class-based, invidiously discriminatory animus.'" *Selep v. City of Chicago*, 842 F. Supp. 1068, 1070-71 (N.D. Ill. 1993) (quoting *Munson v. Friske*, 754 F.2d. 693, 695 (7th Cir. 1985)). Delk fails to make any such showing.

[8] Delk has filed numerous affidavits in response to Defendants' motions, providing additional examples of the prison conditions problems and effects. He also appears to be attempting to raise new and additional claims of verbal threats, sexual harassment, false disciplinary charges, and retaliation. The court advised Delk early in this action, however, that under the Federal Rules of Civil Procedure, his amended complaint itself must state all of the claims that he wished to bring against each defendant. Delk's amended complaint does not include any claim about threats, sexual harassment, false charges, or retaliation. Because Delk has not moved for leave to file a second amended complaint to raise new claims on these issues, I do not consider these attempted claims to be properly before the court. Delk remains free to raise these claims in a separate civil action, provided that he shows full exhaustion of administrative remedies and makes appropriate financial arrangements for the filing fee.

10

Defendants[9] have now filed a renewed motion for summary judgment, incorporating by reference the affidavits submitted with their earlier motion. In addition, they have provided Delk with extensive discovery materials. They contend that they are entitled to summary judgment on the merits of Delk's due process claim, that his prison conditions claim must be dismissed for failure to exhaust administrative remedies in compliance with 42 U.S.C. § 1997e(a), and that the religious diet claim must be dismissed as moot or without merit. Delk has responded to Defendants' motion, making it ripe for consideration.[10]

---

[9] The defendants to the remaining claims are: Younce, Swiney, Turner, Day, Franklin, Payne, Mathena, Walrath, Hinkle, Hamilton, King, and Cei.

[10] Although Delk has two pending motions to compel additional discovery, I conclude that both motions must be denied. In the first motion (docket no. 124), Delk contends that the defendants should be sanctioned because they had failed to respond to numerous discovery requests that he had filed with the court, both before the defendants waived service in this case and after I denied the defendants' first summary judgment motion. The defendants responded to this motion by noting that Delk did not properly serve any of his discovery requests on defendants' counsel, a fact that Delk does not dispute. *See* Fed. R. Civ. P. 5(a)(1)(C) (requiring parties to serve discovery papers on each other). Defendants voluntarily agreed to respond to the unserved discovery requests, however, and the magistrate judge granted them an extension of time to do so. For lack of merit, I will deny this motion to compel and motion for sanctions. *See* Fed. R. Civ. P. 5(b).

In the second motion to compel (docket no. 128), Delk complains that the defendants have refused to provide some documents he requested and have provided evasive or incomplete answers to some interrogatories. I have reviewed the challenged responses and conclude that the defendants' objections must be sustained and that their responses are sufficient. Furthermore, Delk has not demonstrated that lack of any of the information he seeks to compel is necessary to his response to the defendants' arguments on summary judgment. Accordingly, I will deny this second motion to compel.

In another submission, Delk seeks the benefit of a "Rule 26(f) Conference" concerning outstanding discovery (docket no. 107). He is not entitled to such a conference, however. A civil action "brought without an attorney by a person in the custody of . . . a state" is exempted from the provisions of Rule 26(f), including the discovery conference provision. *See* Fed. R. Civ. P. 26(a)(1)(B)(iv) and 26(f)(1).

Finally, Delk has filed a "request" (docket no. 108) for: (a) an examination by a psychiatrist and a medical specialist; (b) the opportunity to depose all defendants' witnesses and experts; and (3) "the opportunity to depose[,] send interrogatories [to,] and receive affidavits from other prisoners" in Red Onion's SLS unit and general population units. This "request" does not comply with Rules 30 and 45 as necessary to conduct depositions. Moreover, Delk offers no indication that given his stated indigency, he could comply with the financial obligations that accompany the taking of depositions. The court has no funding to finance such proceedings for an indigent litigant in a civil action. Furthermore, the rules of discovery do not authorize a party to seek medical examinations at the expense of the court or the defendants, or entitle him to circumvent prison rules concerning communication between inmates. *See, e.g., Kruitbosch v. Van De Veire*, 973 F.2d 1267, 1992 WL 313121, at *1 ("Rule 35(a) does not give the district court authority to order an independent mental examination at government expense.") (unpublished) (citing *Boring v. Kozakiewicz*, 833 F.2d 468, 474 (3d Cir. 1987) ("Congress has not made provision for payment of expert witness fees for indigent plaintiffs in civil actions.")).

11

## II. DISCUSSION

### A. Standard of Review

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To preclude summary judgment, the dispute about a material fact must be "genuine," meaning that "the [disputed] evidence [must be] such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In reviewing the evidence, the court must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence." *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004).

Delk filed a verified complaint, which is the "the equivalent of an opposing affidavit for summary judgment purposes." *World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.*, 783 F.3d 507, 516 (4th Cir. 2015) (internal quotation marks omitted). Detailed factual allegations in a verified, pro se complaint, if based on personal knowledge, may be sufficient to withstand a motion for summary judgment with supporting affidavits containing a conflicting version of the facts. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (citation omitted). Delk cannot defeat Defendants' properly supported summary judgment motion, however, with mere groundless generalizations or speculation. *Cox v. County of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001) ("Mere speculation by the non-moving party cannot create a genuine issue of material fact.").

Case 7:14-cv-00643-NKM-RSB    Document 145    Filed 03/14/17    Page 12 of 27    Pageid#: 886

## B. Due Process

"To state a procedural due process violation,[11] a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted).

As a convicted prisoner, Delk does not have an inherent, constitutionally protected liberty interest in release from a more restrictive security classification. *Id.* at 221-22. A state-created liberty interest may exist, however, if Delk (a) points to "a basis for an interest or expectation in state regulations" in avoiding the conditions of his confinement under the segregation classification scheme at Red Onion, *Prieto*, 780 F.3d at 250; and (b) shows that those conditions "impose[] atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 484 (1995). Only if Delk makes both showings does the Due Process Clause require a particular measure of procedural protection before he can be deprived of his liberty interest. *Id.*

I have already held that the VDOC's policy requiring that the ICA perform periodic reviews of each SLS inmate, as required in OP 830.2 § IV, ¶ G.7, creates an interest in avoiding or being removed from the SLS classification, its conditions and restrictions. *Delk*, 2016 WL 1298389, at *6. *See Incumaa v. Stirling*, 791 F.3d 517, 527 (4th Cir. 2016) (finding that state

---

[11] Delk may also be contending that OP 830.A violates his substantive due process rights. Such a claim fails, however. It is well established that "the Due Process Clause affords [the inmate] no greater protection than does the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 327 (1986). Thus, Delk's claims that living conditions in segregation constitute punishment "fall squarely within the ambit of the Eighth Amendment — not the due process clause." *See Prieto v. Clarke*, 780 F.3d 245, 251 (4th Cir. 2015). Therefore, I will address separately Delk's complaints about living conditions in SLS, under the applicable legal standard for Eighth Amendment claims.

13

prison's policy requiring periodic classification reviews for segregation inmates created potential liberty interest). In addition, OP 830.A, § IV, ¶ K.5 and Appendices F and G provide that the ICA will review SLS inmates' statuses every 90 days and decide whether their step assignments are appropriate.

I must next determine if Delk's continued confinement in SLS imposes "atypical and significant hardship" compared to the "ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. The "conditions dictated by a prisoner's conviction and sentence are the conditions constituting the 'ordinary incidents of prison life' for that prisoner." *Prieto*, 780 F.3d at 253. Because Delk was previously assigned to a general population status, I will use that status as the normative baseline for his due process claim. *See Incumaa*, 791 F.3d at 527.

Mere limitations on privileges, property, and activities for administratively segregated inmates . . . fall[ ] within the expected perimeters of the sentence imposed by a court of law." *Sandin*, 515 U.S. at 485; *Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991) (holding that "changes in a prisoners' [sic] location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges — matters which every prisoner can anticipate are contemplated by his original sentence to prison — are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage the prisons safely and efficiently"). It is well established that a temporary assignment to segregated confinement — thirty days or even six months, with reduced privileges, few out-of-cell activities or socialization opportunities, and heightened security measures — is *not* atypical or significant hardship. *See Sandin*, 515 U.S. at 485-86; *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (finding six months under conditions dictated by administrative segregation policies was not atypical under *Sandin*). "The

14

State's first obligation must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves." *Wilkinson*, 545 U.S. at 227. Thus, "correctional officials . . . must have substantial discretion to devise reasonable solutions to the problems they face" in maintaining prison security and safety. *Florence v. Bd. of Chosen Freeholders*, 132 S. Ct. 1510, 1515 (2012). Accordingly, current precedent mandates minimal court involvement "in the day-to-day management of prisons." *Wilkinson*, 545 U.S. at 222 (citing *Sandin*, 515 U.S. at 482-83).

The Supreme Court in *Wilkinson* found that the challenged supermax confinement conditions imposed atypical and signficiant hardship under *Sandin* based on three distinctive characteristics. First, these supermax inmates were "deprived of almost any environmental or sensory stimuli and of almost all human contact." *Wilkinson*, 545 U.S. at 214. Second, they were assigned to supermax status for "an indefinite period of time, limited only by [the] inmate's sentence." *Id.* Third, "[i]nmates otherwise eligible for parole los[t] their eligibility while incarcerated" at the supermax. *Id.* at 215. The Court held: "While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." 545 U.S. at 224. Similarly, in *Incumaa*, the Fourth Circuit found a protected liberty interest in avoiding assignment to South Carolina's supermax prison based on the isolating and restrictive nature of the living conditions combined with the length and indefiniteness of the plaintiff's twenty-year confinement there.[12] 791 F.3d at 531-32.

The prison policies in these cases provided "no indication how long [an inmate] may be incarcerated [at the supermax] once assigned there," *Wilkinson*, 545 U.S. at 215, because they provided for infrequent review of the continued appropriateness of an inmate's specific

---

[12] In addition to these conditions, the plaintiff in *Incumaa* was subjected to "a highly intrusive strip search every time he [left] his cell." 791 F.3d at 531.

segregation status and offered no clear criteria for him to become suitable for release from the supermax. *Incumaa*, 791 F.3d at 522-23. Authorities repeatedly recommended the inmates' retention at the supermax without providing any behavioral basis for doing so. *See id.* at 521-23.

Conditions of confinement in the VDOC's "special housing" units, including SLS, are highly restrictive. SLS inmates, particularly those in IM-0 or SM-0, face single-cell assignment, little face-to-face contact with other inmates, and limited freedom of movement and privacy. The mere existence of these undesirable conditions for SLS inmates at Red Onion, however, does not render their confinement atypical or significantly harsh, because VDOC general population inmates can expect temporary terms in segregated confinement under similar restrictions. *See Sandin*, 515 U.S. at 486 (thirty days); *Beverati*, 120 F.3d at 504 (six months).

Moreover, in many other ways, living conditions in SLS approximate conditions for general population inmates. As stated, they have access to hygiene and legal materials, telephone usage, legal counsel, medical and mental health care, library books, commissary items, ingoing and outgoing mail services, and the grievance procedure. They may possess property items, including religious materials, in their cells, and they receive laundry services and visitation opportunities. Per policy, SLS inmates receive the same types of meals that general population inmates receive.

Delk alleges that as an SLS inmate, he was prohibited from "almost all human contact" from cell to cell conversation, and had "[n]o possibility of intellectual stimulation." (Am. Compl. 8.) However, the evidence in this case does not support a finding that Delk was subjected to the sort of prolonged, extreme deprivation of sensory stimuli or social contact that gave rise to the concerns in *Wilkinson*, 545 U.S. at 214 (noting that supermax inmates were "deprived of almost any environmental or sensory stimuli and of almost all human contact" . . .

16

"for an indefinite period of time").  Among other things, the record indicates that Delk was able to converse with officers and with other inmates, although with some difficulty, and have phone privileges and visitation.

Most importantly, Delk's confinement at SM-0, under the most restrictive conditions for SLS inmates, is not indefinite.  VDOC policy requires review of each inmate's SLS status at least every 90 days, and the evidence is that Delk has received such reviews at the required frequency.  The step-down policy clearly defines actions Delk could take to be considered for status changes to greater privileges and less restrictive conditions:  participating in the step-down programming, holding a job assignment, and remaining infraction free.  Thus, Delk's progress (or lack of progress) toward a less restrictive security level has rested on his choices.  The policy and the evidence indicate that if Delk had sooner chosen to work through the *Challenge Series* and avoided incurring disciplinary charges, he would have been evaluated for steps toward SL6 and, eventually, back to a general population setting.

After careful review of the record, I conclude that the VDOC's policies do not create a constitutionally protected liberty interest in avoiding SLS status or any particular pathway within that status.  Specifically, I conclude that the step-down procedures available to SLS inmates address and alleviate the isolating conditions and indefiniteness identified in *Wilkinson* and *Incumaa* as distinguishing factors of "atypical and significant" hardships in a long-term segregation scheme.  An SM-0 status inmate is subject to long-term, restrictive conditions, but that status is not indefinite if the inmate chooses to participate in the step-down procedures.  OP 830.A provides behavioral criteria for the inmate to qualify for incremental reductions of restrictions and increases in privileges.  With concerted effort to change his thinking and behavior, the inmate can earn his way to enjoyment of additional social interaction and activity

17

while in segregated confinement. As such, under OP 830.A, an inmate's confinement in Red Onion's most restrictive conditions is only as lengthy as dictated by his own effort and behavior.

Furthermore, I do not find that Delk's SM-0 status inevitably affected the length of his confinement so as to trigger a constitutionally protected liberty interest. *Sandin*, 515 U.S. at 487. Nothing in the SLS policies before the court indicates that assignment to this status terminates an inmate's parole eligibility or denies him the chance to earn good conduct time. Moreover, Delk does not state facts indicating that he was ever eligible for parole on the sentences he is serving.

Delk complains that he *cannot* earn good conduct time while in SLS status. Because he presents no evidence to support this conclusory assertion, however, it cannot give rise to a genuine issue of fact. *Cox*, 249 F.3d at 299. Delk lost his ability to earn good conduct time in April 2013, based on his own conduct, not on his SLS or SM-0 status. Specifically, the ICA reduced Delk to Level 4 (earning no good time) because he had received five disciplinary charges in the previous month, including four charges for possessing a weapon or razor blade.

For the reasons stated, I find no material fact in dispute on which Delk can establish that his confinement at Red Onion under OP 830.A is atypical and significantly harsh compared to conditions contemplated by his sentence.[13] Thus, I conclude that Delk has no constitutionally protected liberty interest in avoiding classification to SLS or assignment or reassignment to a particular privilege level under OP 830.A. Therefore, he also has no actionable claim under

---

[13] *See, e.g., Muhammad v. Mathena*, No. 7:14cv00529, 2017 WL 395225 (W.D. Va. Jan. 27, 2017) (finding no constitutionally protected liberty interest in avoiding IM status under Red Onion's step-down procedures) (Conrad, J.); *DePaola v. Va. Dep't of Corr.*, No. 7:14cv00692, 2016 WL 5415903 (W.D. Va. Sept. 28, 2016) (same) (Jones, J.).

18

§ 1983 that any particular procedural protection is constitutionally required during the OP 830.A classification assignment and review proceedings.[14]  *Sandin*, 515 U.S. at 486-87.

Delk also has no claim under § 1983 that any of the defendants have misconstrued or misapplied the OP 830.A procedures or that procedures during pathway or step assignments and reviews are inconsistent with other VDOC policies.  State officials' failure to abide by state procedural regulations is not a federal due process issue, and is, therefore, not actionable under § 1983.  *Riccio v. Cty. of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990) ("If state law grants more procedural rights than the Constitution would otherwise require, a state's failure to abide by that law is not a federal due process issue.").

For the stated reasons, Defendants are entitled to judgment as a matter of law as to Delk's claims that one or more of them assigned him to SLS or the SM pathway, or refused to change these classifications, without due process in violation of his constitutional rights.  I will grant Defendants' motion for summary judgment on Delk's due process claims accordingly.

## C.  Conditions of Confinement

While prison officials must "take reasonable measures to guarantee the safety of the inmates" in their custody, *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984), "[t]o the extent that [prison living] conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society."  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). "The Eighth Amendment does not prohibit cruel and unusual prison conditions; it prohibits cruel and unusual punishments.  If a prisoner has not suffered serious or significant physical or mental injury as a result of the challenged condition, he simply has not been subjected to cruel and unusual punishment within the meaning of the Amendment."  *Strickler v. Waters*, 989 F.2d 1375,

---

[14]    In any event, even if Delk could show that SM pathway conditions are atypical, I conclude that the multi-level formal and informal status reviews provided regularly to Delk substantially mirror the procedures found to be constitutionally adequate in *Wilkinson*.  545 U.S. at 224-29.

19

1381 (4th Cir. 1993).   Defendants assert that Delk's Eighth Amendment claim that harsh conditions in SM-0 status have allegedly harmed him must be dismissed for failure to exhaust administrative remedies.  I agree.

The Prison Litigation Reform Act provides in 42 U.S.C. § 1997e(a) that a prisoner cannot *bring* a civil action concerning prison conditions until he has first exhausted available administrative remedies.   *Porter v. Nussle*, 534 U.S. 516, 524 (2002).   This exhaustion requirement applies to "all inmate suits, whether they involve general circumstances or particular episodes, . . . whether they allege excessive force or some other wrong," and whether the form of relief the inmate seeks is available through exhaustion of administrative remedies.  *Id.*  Failure to follow the required procedures of the prison's administrative remedy process, including time limits, or to exhaust all levels of administrative review is not "proper exhaustion" and will bar an inmate's § 1983 action.  *Woodford v. Ngo*, 548 U.S. 81, 90 (2006).

An inmate in VDOC custody meets the § 1997e(a) requirement by pursuing his claim through each level of the VDOC's regular grievance procedure, including available appeals.  OP 866.1 (docket no. 25-2.)  First, the inmate must attempt to resolve his personal complaint informally with staff, typically by filing an informal complaint form, which prison staff must address in writing and return within 15 days from receipt.  Then, the inmate initiates a regular grievance by submitting the grievance form and attached informal complaint within 30 days of the events at issue.  If the responding official determines the grievance to be "unfounded" at Level I, the inmate may appeal that holding to Level II, the regional administrator, and in some cases, to Level III.

A regular grievance rejected at intake for procedural inadequacies, as untimely or as a request for services inappropriately filed as a grievance, is promptly returned to the inmate.  He

may appeal that intake decision, or he may correct the reason for the rejection and resubmit his regular grievance. To satisfy the exhaustion requirement, the inmate must submit a procedurally acceptable regular grievance with the appropriate informal complaint attached, and appeal it through all available appeal levels.

As stated, Delk's Eighth Amendment claim contends that SM-0 conditions are cruel and unusual, based on numerous features, including: little human contact or intellectual stimulation, constant lighting, allegedly unsanitary food service and ventilation system, cold and smaller food portions, verbal abuse, loud noises and flooding or feces throwing by other inmates, and strip search and restraint procedures. Delk asserts that these conditions have aggravated his asthma, caused him to lose weight and develop hand tremors and seizures, as well as head and shoulder pain. Defendants provide the affidavit of the Red Onion grievance coordinator, J. Messer. Based on review of Delk's grievance records, Messer states that before Delk filed this lawsuit, he did not properly file regular grievances or complete the grievance appeal procedures as to his claim that these particular living conditions in SM-0 status have allegedly harmed him in the ways he alleges or presented a substantial risk that such harm would occur.

Delk has indicated on a verified statement form that he "exhausted administrative remedies as to each of the claims raised . . . by appealing . . . to the highest available level of the administrative remedies procedures." (V.S., docket no. 6.) He does not provide copies of the remedies procedure forms and responses on SLS conditions to support this generalization, however. At the most, Delk states in the verified amended complaint that in July 2013, he "filed a grievance on the severe conditions of LTS/SLS which he was force[d] to endure," that it was "denied intake [as] not grie[v]able," and that the intake decision was upheld on appeal. (Am. Compl. 14, docket no. 32.) Delk does not provide a copy of the July 2013 grievance to

demonstrate that it specifically complained about SLS or SM-0 conditions causing harm to him, personally. Even after discovery, Delk presents no evidence demonstrating that he properly pursued all the steps under the grievance procedure regarding his contentions of being harmed or placed at risk of harm by any specific SLS and SM-0 conditions.[15]

The defendants bear the burden of proving the affirmative defense that Delk did not exhaust before filing suit. *Jones v. Bock*, 549 U.S. 199, 216 (2007). Now that they have done so, Delk may yet escape summary judgment under § 1997e(a) if he states facts showing that the remedies under the established grievance procedure were not "available" to him. *Ross*, 136 S. Ct. at 1859 (noting that circumstances making prison grievance procedures unavailable "will not often arise"). Generally, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was *prevented* from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (emphasis added).

Delk contends that he exhausted administrative remedies to the extent that they were *available* to him at Red Onion. Delk argues that he "cannot be expected to continue to follow the procedure on issues reminding the defendants of the same problem repeatedly after [they] refuse to take corrective action in response to his earlier attempts" that were rejected and that Defendants "were given fair opportunity to address the problem." (Pl.'s Mem. Opp. To M. Summ. J. ¶ 60, docket no. 81.) Delk also points to numerous grievances he filed, complaining about classification reviews under OP 830.A — grievances that were rejected on intake as untimely because they were filed more than 30 days after the effective date of OP 830.A; other

---

[15] The lengthy record in this case includes evidence that Delk had access to the necessary forms to exhaust remedies, but does not dispute Defendants' evidence of nonexhaustion. For example, among Delk's many exhibits, he submits a grievance receipt report dated September 4, 2013, summarizing his grievance as follows: "States he is being subjected to an unsafe and unsanitary environment – the treat [sic] of a contagious disease or air borne virus is very real – offenders living in their own filth is a serious threat to his health and safety – wants medical to do something about it." (Delk Aff. Ex. 21, at 9, docket no. 82-4.) Delk has not provided a copy of the grievance itself, provided a copy of the response he received to it, or demonstrated that he pursued all available appeals, if any.

grievances on this topic were rejected as "requests for services." Delk asserts that these rejections were based on Defendants' misinterpretation of the grievance procedure language to prevent him from exhausting his classification and dietary claims. He contends that because Defendants thus "used subterfuge to avoid" accepting his grievances, he "had no duty to file additional grievances." (Pl.'s Mem. Opp. To M. Summ. J. ¶ 60, docket no. 81.)

In essence, Delk contends that Defendants made the grievance procedure unavailable by misapplying it to some prior grievances on other matters in ways that convinced him any further attempt at filing grievances on living conditions in SM-0 status was futile. *See Ross*, 136 S. Ct. at 1859-60 (holding that grievance procedure may be deemed unavailable if "officers [are] unable or consistently unwilling to provide any relief to aggrieved inmates," if "rules are so confusing that . . . . no reasonable prisoner can use them," or if officials "thwart inmates from taking advantage of [it] through machination, misrepresentation, or intimidation") (internal quotation marks omitted). Defendants' evidence is, however, that a grievance complaining that particular SM-0 or SLS living conditions were causing Delk physical or mental harm would not have been rejected as nongrievable. Delk does not allege that he made any attempt to file such a grievance. His contention of futility is nothing more than a self-serving and conclusory conjecture, *Cox*, 249 F.3d at 299, and not a genuine issue of disputed fact on which Delk could prove the procedure was truly unavailable to him on the topic of harmful conditions. Therefore, I will grant Defendants' motion for summary judgment for failure to exhaust and will dismiss Delk's Eighth Amendment claims under 42 U.S.C. § 1997e(a).[16]

---

[16]     In any event, I also conclude that Delk's conditions claim fails on the merits. To sustain an unconstitutional conditions claim, a prisoner must show that: (1) objectively, the deprivation was sufficiently serious, in that the challenged official acts caused denial of "the minimal civilized measure of life's necessities"; and (2) subjectively, the defendant prison officials acted with "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). To prove deliberate indifference, the inmate must show that the official was aware of facts from which he could draw an inference that a substantial risk of harm existed, that he actually drew that inference, and that he disregarded the risk by failing to take

23

### D. Religious Diet Concerns

Defendants argue that I must dismiss Delk's claim for injunctive relief regarding his religious diet and that his claim fails on the merits, in any event, because he has not presented facts showing how Defendants' actions placed a substantial burden on his religious practice. I conclude that both arguments are well taken and will grant summary judgment.

An inmate's claims for declaratory or injunctive relief are moot if "[a]ny [such] relief ordered in the inmate's favor . . . would have no practical impact on [his] rights" or he "has no further need for [the requested] declaratory or injunctive relief, for he is free of the policy or practice that provoked his lawsuit in the first place." *Incumaa v. Ozmint*, 507 F.3d 281, 287 (4th Cir. 2007). The evidence is that Delk stands in this position. His original request for injunctive relief was to receive "the Common Fare diet 3 times daily conforming to his medical needs." (Am. Compl. 23, docket no. 32.) His submissions indicate that by June 10, 2015, he was receiving Common Fare meals, and by June 18, the kitchen staff had approved a change to those meals to accommodate his allergy to beans. By that point, Delk was "free" of the "policies that provoked his lawsuit," and his diet claim was moot. Moreover, by March 2, 2016, Delk also received accommodation of his religious aversion to eggs, when he began receiving Common Fare trays omitting this food item.[17] On this evidence, I conclude that Delk's claims for

---

"reasonable measures" to alleviate the risk. *Id.* at 847. Delk has not pointed to evidence proving either facet of the Eighth Amendment standard; specifically, he has not identified evidence showing that the SLS conditions have *caused* him any serious mental or physical harm or are likely to do so, or that Defendants were aware that SLS conditions posed a risk of such harm.

[17] Delk does not allege that since arriving at Wallens Ridge in January 2017, his VDOC approval for Common Fare meals has been discontinued or that kitchen staff there have served him eggs or beans. Moreover, if Wallens Ridge staff does not immediately accommodate his aversions to eggs and beans, he will need to exhaust administrative remedies there before he can pursue any action in this court on the matter. 42 U.S.C. § 1997e(a).

24

declaratory and injunctive relief regarding his religious diet are properly dismissed as moot.[18]  I also conclude, however, that Delk's religious diet claim fails on the merits.

"RLUIPA prohibits [state] prisons from imposing a substantial burden on an inmate's religious exercise unless prison officials can demonstrate that the burden furthers a compelling governmental interest by the least restrictive means."  *Miles v. Moore*, 450 F. App'x 318, 319 (4th Cir. 2011) (unpublished per curiam) (citing 42 U.S.C. § 2000cc-1(a)).  The inmate "bears the initial burden to demonstrate that the prison's policy exacts a *substantial burden* on religious exercise."[19]  *Incumaa v. Stirling*, 791 F.3d 517, 525 (4th Cir. 2016).

A prison regulation imposes a "a substantial burden on religious exercise" when it "'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir.2006) (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)) (applying Free Exercise Clause of the First Amendment). "[A]t a minimum the substantial burden test requires that a . . . plaintiff demonstrate that the government's denial of a particular religious . . . observance was more than an inconvenience to [his] religious practice."  *Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007) (citing *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004)).  No substantial burden occurs if the government action merely makes the "religious exercise more expensive or difficult," but fails to pressure the adherent to violate his or her religious beliefs or abandon one

---

[18]   Delk complains in one affidavit, dated March 1, 2016, that he was still "being denied a no bean diet." (Delk Aff. ¶ 7, docket no. 93.)  This contention apparently refers to so-called "soymeats" included in the Common Fare meals; Delk believes they contain beans, but kitchen staff tell him they do not contain beans. (*See* Delk Aff., at 5, docket no. 137.)  I cannot find that this disagreement over the contents of meat substitutes in Delk's meals prevents his Common Fare diet claim from being moot.

[19]   Only if Delk proved that Defendants' policies placed a substantial burden on his religious practice would "the burden shift[ ] to [Defendants] to prove [their] policy further[ed] a compelling governmental interest by the least restrictive means."  *Incumaa*, 791 F.3d at 525.  Because Delk fails to establish a substantial burden, Defendants are entitled to summary judgment without discussion of the other RLUIPA elements.

25

of the precepts of his religion. *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 739 (6th Cir. 2007).

Delk simply has not met his threshold evidentiary burden to prove a substantial burden existed. First, Delk's description of his religious dietary requirements is vague, at best: pure, natural, and organic foods, but no eggs. He does not identify any particular food items, other than eggs and egg products, that are prohibited or required for an adherent of his religion. Second, Defendants have accommodated Delk's stated religious dietary needs. In 2013, Delk asked for no eggs, and he received a no-egg diet order. This accommodation continued until Delk, at his own request, switched to Common Fare in June 2015. Delk does not complain that the no-egg diet included foods types or items inconsistent with his religion. Similarly, Delk does not identify any features of the Common Fare menu that would more completely have accommodated his purported religious need for organic, pure, and natural foods than did the no-egg diet he received from 2013 to 2015.[20] Indeed, in 2015, he complained that the Common Fare menu itself contained eggs, in violation of his dietary requirements. Delk admits, however, that he never ate the eggs he received. He merely threw them away. Within a year, Defendants also accommodated his request to receive substitution foods in place of eggs on the Common Fare menu.

On these facts, I conclude that Delk has failed to marshal evidence that his diet at Red Onion, at any time, "put substantial pressure" on him "to modify his behavior and to violate his beliefs." *Lovelace*, 472 F.3d at 187. Thus, he has not demonstrated that Defendants' policies or

---

[20] The VDOC Common Fare regulations in the record prohibit serving any food items, other than fresh fruits and vegetables, that are not certified as kosher; serving or using any pork or pork derivatives; and serving dairy and meat in the same meal. These regulations do not use the terms organic, pure, or natural to describe the Common Fare goals or components.

26

actions placed a substantial burden on his religious practice, and accordingly, Defendants are entitled to judgment as a matter of law on his religious diet claim.[21]

## III. CONCLUSION

For the reasons stated, I will grant Defendants' motion for summary judgment and, accordingly, I will dismiss Delk's due process and religious rights claims under § 1983 and RLUIPA with prejudice, and will dismiss his Eighth Amendment claim without prejudice under 42 U.S.C. § 1997e(a) for failure to exhaust available administrative remedies. All other remaining claims in the amended complaint I will summarily dismiss for failure to state a claim under 28 U.S.C. § 1915(e)(2)(b)(ii).

The clerk will send the parties a copy of this memorandum opinion and the accompanying order.

ENTER: This 14th day of March, 2017.

Norman K Moon

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

---

[21] Delk expressly raised his religious diet claim under the section heading: "CROSS CLAIM no: 2 VIOLATION OF FEDERAL STATUTE 42 USCA 2000cc et seq. RLUIPA." (Am. Compl. 17, docket no. 32.) Thus, justifiably, Defendants interpreted Delk's amended complaint as presenting only a claim under RLUIPA. Delk now contends that he also presented this claim under the Free Exercise Clause of the First Amendment. The amended complaint does not mention the First Amendment in the religious diet section at all, and at the most, mentions the "right to exercise his religion," a phrase also used in RLUIPA. (*Id.* 20.) Even if I were to construe Delk's *pro se* pleadings as raising a First Amendment claim, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (requiring liberal construction of *pro se* pleadings), such a claim fails for the same reason that Delk's RLUIPA claim does: Delk does not present any facts showing a substantial burden on his religious practice. *See Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989) (holding that First Amendment free exercise claim requires showing that challenged practice substantially burdens plaintiff's sincere, religious practice); *Thomas*, 450 U.S. at 718 (defining substantial burden for First Amendment claim).

27